**EXTER SHIPPING LIMITED,**
Plaintiff,

v.

**Stamatios I. KILAKOS,**
et al., Defendants.

**Crest Shipping Limited, Plaintiff,**

v.

**Stamatios I. Kilakos, et al., Defendants.**

**Stanley Shipping Limited, Plaintiff,**

v.

**Stamatios I. Kilakos, et al., Defendants.**

**Wyndham Shipping Limited, Plaintiff,**

v.

**Stamatios I. Kilakos, et al., Defendants.**

Nos. 1:02–CV–1443–TWT, 1:02–CV–1665–TWT, 1:02–CV–1666–TWT, 1:02–CV–1667–TWT.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 29, 2004.

Laura Lewis Owens, Shannon Thyme Klinger, Alston & Bird, Atlanta, GA, Stephan Skoufalos, phv Manuel R. Llorca, phv, Skoufalos Llorca & Ziccardi Stamford, CT, for plaintiff.

Thomas J. Strueber, J. David Hopkins, Paul T. Kim, Jonathan R. Friedman, Lord Bissell & Brook, Paul Joseph Murphy, Cheri A. Grosvenor, Komal Patel, David M. Chaiken, King & Spalding, Cheryl L. Haas–Goldstein, Sutherland Asbill & Brennan, Elizabeth White, Boswell, Smith Moore, Atlanta, GA, for defendant.

### ORDER

THRASH, District Judge.

These actions for breach of contract, indemnity and fraud arise out of contracts to ship cargoes of oil in international commerce. The Plaintiffs are four Maltese shipping companies. The Defendants are citizens of Greece. The cases are before the Court on the Defendants' Motions to Dismiss for Lack of Personal Jurisdiction, the Defendants' Motions to Dismiss Pursuant to the Doctrine of *Forum Non Conveniens*, and the Defendants' Motions to Dismiss for Lack of Subject Matter Jurisdiction. In summary, although the Court has subject matter jurisdiction, the Plaintiffs have failed to demonstrate that the Defendants have sufficient connection with this forum to permit this Court to exercise jurisdiction over them. Alternatively, as public and private interests favor the adjudication of this dispute in alternative fora, the Court declines to exercise jurisdiction pursuant to the doctrine of *forum non conveniens*. Thus, for the reasons set forth below, the Defendants' Motions to Dismiss for Lack of Personal Jurisdiction are GRANTED, the Defendants' Motions to Dismiss Pursuant to the Doctrine of *Forum Non Conveniens* are GRANTED, and the Defendants' Motions to Dismiss for Lack of Subject Matter Jurisdiction are DENIED.

### I. BACKGROUND

Plaintiffs Exter Shipping Ltd. ("Exter," the owner of the Shoko), Crest Shipping Ltd. ("Crest," the owner of the Epic), Stanley Shipping Ltd. ("Stanley," the owner of the Cherry), and Wyndham Shipping Ltd. ("Wyndham," the owner of the Addax) are four Maltese shipping companies. The Plaintiffs are managed by Dynacom Tankers Management, Ltd. ("Dynacom"), a company headquartered in Greece. In 1996 and 1997, the Plaintiffs entered into time charter agreements with Metro Trading International, Inc. ("Metro Trading"), a Liberian company engaged in the purchase, sale, and shipment of oil. Pursuant to these contracts, the Plaintiffs chartered their vessels to Metro Trading for the purpose of transporting oil to and from Metro Trading's storage facility off the coast of Fujairah in the United Arab Emirates.

In February 1998, Metro Trading became insolvent. The storage facility con-

tained less oil than was required to satisfy Metro Trading's liabilities for delivery of the product. Numerous parties in Europe and Asia, including the Plaintiffs, asserted competing rights to Metro Trading's assets. The English courts appointed a receiver to sell the oil remaining in storage and afloat. About $50 million was collected by the receiver for the benefit of the conflicting claimants which included oil companies such as Glencore International AG ("Glencore"), banks which financed Metro Trading, purchasers of the oil, ship owners and insurers. In the United Kingdom, about 35 actions were filed involving some 50 parties. On February 16, 1998, the Plaintiffs obtained a judgment against Metro Trading for $2.8 million, an amount secured by the oil then on board the Plaintiffs' vessels. This amount was allegedly secured to satisfy unpaid hire and bunker charges or damages under the time charters with Metro Trading. This led Glencore, a European oil trader using Metro Trading's Fujairah facility, to intervene. Asserting that the Plaintiffs diverted oil which was supposed to have been delivered to Metro Trading's Fujairah facility, Glencore filed *in rem* admiralty actions in the United Kingdom against the Plaintiffs, securing the "arrests" of the Plaintiffs' vessels. One vessel was arrested in England and three were arrested in Singapore. Glencore also successfully sued the Plaintiffs in the United Kingdom for conversion. The Queen's Bench Division found that the oil that the Plaintiffs had transported rightfully belonged to Glencore.

After participating in the United Kingdom litigation, on July 23, 2001, the Plaintiffs filed suit in this Court against Glencore, Metro Trading, and a purported Metro Trading–Glencore joint venture. *Stanley Shipping Ltd., et al. v. Metro Trading International, Inc., et al.*, No. 1:01–CV–1929–TWT. That case raised claims and issues similar to those adjudi-cated or to be adjudicated in the English proceedings. In response, on July 31, 2001, Glencore applied to the Queen's Bench Division for an antisuit injunction barring the Plaintiffs from prosecuting the action in this Court. The Queen's Bench Division granted Glencore's request on November 8, 2001, and the English Court of Appeal unanimously affirmed this grant on April 18, 2002. In response, the Plaintiffs dismissed the action in this Court.

The Plaintiffs then filed this action. The Plaintiffs named as Defendants Rima Marine, the Swedish entity that allegedly negotiated the disputed time charter agreements with the Plaintiffs on Metro Trading's behalf, and its alleged principal, Jarl Dittmer, a resident and citizen of Sweden. Additionally, the Plaintiffs named four residents and citizens of Greece as Defendants: Ioannis Mavrakakis, Stamatios I. Kilakos ("S. Kilakos"), Ioannis S. Kilakos ("I. Kilakos"), and Margarita Gene. The Plaintiffs allege that Mavrakakis is a former principal of Metro Trading and that S. Kilakos, I. Kilakos, and Gene served as principals of Metro Trading during the relevant time period. Finally, the Plaintiffs also named as Defendant Mayamar Marine Enterprises, S.A. ("Mayamar"), a Panamanian corporation domiciled in Greece that is owned by Mavrakakis and served as broker for Rima Marine. The Plaintiffs have since dismissed Defendants Rima Marine and Dittmer from this action.

The Plaintiffs allege that the Defendants conspired to misrepresent Metro Trading's financial viability to induce the Plaintiffs to enter into the time charter contracts at issue. The Plaintiffs also allege that the Defendants depleted Metro Trading of its assets through fraudulent conveyances. The Plaintiffs claim that these actions caused Metro Trading's collapse, the arrests of the Plaintiffs' vessels, litigation

expenses to defend against Glencore's conversion claims, and damages resulting from the Plaintiffs' inability to use or charter their vessels. The Defendants move for dismissal of the Plaintiffs' claims based on lack of subject matter jurisdiction, lack of personal jurisdiction and *forum non conveniens*.

## II. *DISCUSSION*

### A. *Subject Matter Jurisdiction*

The Defendants move to dismiss this action for lack of subject matter jurisdiction. Specifically, the Defendants maintain that the operative facts as alleged in the Plaintiffs' complaints and the applicable law demonstrate that the Plaintiffs have not satisfied the requirements of federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333. Article II, section 2, of the United States Constitution extends the judicial power of the United States "to all Cases of admiralty and maritime Jurisdiction." Section 1333 provides, in relevant part, that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of ... [a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). The test for determining the existence of admiralty jurisdiction pursuant to section 1333(1) varies depending on whether the claims are predicated upon contract or tort. *Broughton v. Florida Intern. Underwriters, Inc.*, 139 F.3d 861, 864 (11th Cir.1998); *Harville v. Johns–Manville Products Corp.*, 731 F.2d 775, 780 n. 4 (11th Cir.1984).

#### 1. *Maritime Contract Jurisdiction*

In order to invoke admiralty jurisdiction for a contract claim, the underlying contract must be "wholly maritime in nature, or any nonmaritime elements must be either insignificant or separable." *Wilkins v. Commercial Inv. Trust Corp.*, 153 F.3d 1273, 1276 (11th Cir.1998). A con-

tract qualifies as "maritime" if its "subject matter is necessary to the operation, navigation or management of a ship...." *Id.* The charterparty agreements between the Plaintiffs and Metro Trading involved the operation, navigation, and management of the Plaintiffs' ships. Thus, as the Plaintiffs assert and the Defendants necessarily concede, the charterparty agreements between the Plaintiffs and Metro Trading certainly constitute maritime contracts.

The Defendants, however, do not concede that the maritime nature of the contracts is dispositive of subject matter jurisdiction. First, the Defendants contend that, although the contracts between the Plaintiffs and Metro Trading are maritime contracts, maritime contract jurisdiction is not proper, as the named Defendants were not party to these contracts. *See Continental Cameras Co., Inc. v. Foa & Son Corp.*, 658 F.Supp. 287, 289 (S.D.N.Y. 1987), *aff'd*, 837 F.2d 45 (2d Cir.1987) (holding that a federal court lacked jurisdiction over a claim brought by an insured against an insurance broker, as the broker was not a party to the underlying maritime contract). The Plaintiffs cite the *Arios Pagos* decision of the Greek Supreme Court as the principal support for their assertions that Metro Trading is a de facto general partnership and that the named Defendants, as the general partners, are necessarily parties to the contracts. As discussed in greater detail in the following sections, Greek law and, by extension, the *Arios Pagos* decision do not necessarily govern the corporate status of Metro Trading. But that addresses the merits of the Plaintiffs' claim. The Plaintiffs seek to recover on maritime contractual and indemnification claims. That is sufficient to confer subject matter jurisdiction upon the Court even if those claims ultimately fail.

Even if the Defendants were deemed parties to the contracts through

their association with Metro Trading, the Defendants offer two additional reasons to deny jurisdiction over claims arising from these contracts: the English anti-suit injunction and the contracts' forum selection clauses. As discussed previously, the Queen's Bench Division recognized that the commencement of proceedings against Metro Trading by the Plaintiff shipowners in a district court in Georgia was "vexatious and abusive and constitute[d] unconscionable conduct...." (Queen's Bench Antisuit Injunction Order ¶ 40). Citing this reason, the English Court issued an antisuit injunction order preventing the Plaintiffs from filing suit against Metro Trading for misrepresentation regarding the time charter agreements at bar. The injunction order provides:

> The Respondents, namely Exter Shipping Ltd., Stanley Shipping Ltd., Wyndham Shipping Ltd., and Crest Shipping Ltd., shall be restrained and an injunction is granted restraining each of them from prosecuting or otherwise pursuing, whether by themselves or by any other person, Civil Action No. 1:01–CV–1929 commenced by them in the United States District Court for the Northern District of Georgia, Atlanta Division against any of the defendants named in those proceedings.

*Glencore International AG v. Exter Shipping Ltd., et al.,* 1998 Folio No. 273 (Q.B. Nov. 13, 2001). Although the express language of the antisuit injunction suggests that its scope is limited to the prior action against Metro Trading,[1] the spirit and purpose of the antisuit injunction are threatened by the present suit. Numerous courts have found conduct to violate an injunction when it threatens the spirit, if not the language, of the original order. *See, e.g., Youakim v. McDonald,* 71 F.3d 1274, 1283–84 (7th Cir.1995); *United States v. Christie Industries, Inc.,* 465 F.2d 1002, 1007 (3rd Cir.1972); *John B. Stetson Co. v. Stephen L. Stetson Co.,* 128 F.2d 981, 982 (2nd Cir.1942). "The language of an injunction must be read in the light of the circumstances surrounding its entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." *Christie Industries, Inc.,* 465 F.2d at 1007; *John B. Stetson Co.,* 128 F.2d at 982. The Plaintiffs allege that Metro Trading was a de facto general partnership or an invalid corporate entity and that suit against the Defendants, for both jurisdictional and liability purposes, effectively constituted suit against Metro Trading. Indeed, their claims rely on the longstanding notion that a suit against a partnership is indistinguishable from suit against the individual partners. *Porter v. Hardin,* 164 F.2d 401, 403 (5th Cir.1947).[2] The Plaintiffs' claims against Metro Trading's alleged partners, claims substantially similar to those prohibited by the antisuit injunction, constitute the very "mischief that the injunction seeks to prevent." *Christie Industries, Inc.,* 465 F.2d at 1007. Thus, even if the present action does not contravene the specific language of the antisuit injunction, it violates the spirit and frustrates the purpose of that injunction. Nevertheless, this does not deprive the Court of subject

---

**1.** It is arguable that the words "or otherwise pursuing" contemplate indirect means for perpetuating the lawsuit against Metro Trading and that the language of the order would thus encompass the instant suit against alleged general partners of a Metro Trading de facto partnership.

**2.** In *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

matter jurisdiction. The antisuit injunction will be revisited when the Court addresses the Motions to Dismiss for *Forum Non Conveniens*.

■ The charterparty agreements contain forum selection clauses requiring the Plaintiffs to litigate disputes in England, not the United States. (Charterparty Agreements ¶ 41). Each contract includes the following provision: "This charter shall be construed and the relations between the parties determined in accordance with the laws of England. Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree." *Id.* The Plaintiffs simultaneously contend both (1) that the Defendants are bound by the contracts and are thus subject to admiralty jurisdiction and liable for maritime contract claims; and (2) that the Defendants are not parties to these contracts as regards the forum selection clauses. A plaintiff cannot use a business relationship to establish jurisdiction or liability and then deny that same relationship to prevent the applicability of a forum selection clause. *See XR Co. v. Block & Balestri, P.C.*, 44 F.Supp.2d 1296, 1301 (S.D.Fla.1999). Nevertheless, Eleventh Circuit case law is clear that forum selection clauses in international agreements do not deprive the court of subject matter jurisdiction. *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1289–90 (11th Cir.1998). The parties' agreement to litigate elsewhere may be enforced by a motion to dismiss for improper venue, or in this case the Motions to Dismiss for *Forum Non Conveniens*.

### 2. *Maritime Tort Jurisdiction*

The Defendants further contend that the Plaintiffs' claims arising out of the maritime contract are actually tort claims and, thus, must satisfy the test applicable to maritime torts to justify federal admiralty jurisdiction. *Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919, 924 (11th Cir.2001) (requiring maritime tort analysis for negligence claims arising out of a maritime contract); *Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283, 289 (5th Cir. 1989) (requiring fraudulent inducement and tortious interference claims arising out of a "contract with strong maritime implications" to satisfy the test for admiralty tort jurisdiction). Thus, the Defendants contend that the Plaintiffs, in order to pursue claims for fraudulent inducement, fraudulent misrepresentation and indemnity sounding in tort, must show that these claims qualify as maritime torts.

■ In order to establish admiralty jurisdiction over a tort, a plaintiff must demonstrate that the alleged tort occurred on navigable waters (situs) and bears a significant relationship to maritime activity (nexus). *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 253, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *Broughton v. Florida Intern. Underwriters, Inc.*, 139 F.3d 861, 865 (11th Cir.1998). Under the situs prong of the two-pronged test, the tort is deemed to occur where the tortious act took effect, rather than where the tortious act was done. *Executive Jet Aviation, Inc.*, 409 U.S. at 266, 93 S.Ct. 493; *Harville*, 731 F.2d at 782. The Defendants argue that the impact of the torts against the Plaintiffs on navigable waters is too remote to warrant invoking maritime tort jurisdiction. Specifically, they contend that because the alleged fraud and misrepresentation took place on land where the contracts were executed, the impact of these torts and subsequent financial damage were injuries occurring on land.

The Defendants rely on *Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283 (5th

Cir.1989), to support this contention. Kuehne & Nagel, a freight forwarder, contracted to ship cargo with the carrier Ucamar. Geosource, Inc. was the corporate parent of Ucamar. Kuehne & Nagel alleged that Geosource fraudulently induced it to enter into a shipping contract with Ucamar without revealing that Ucamar had been experiencing serious operational and financial difficulties. Kuehne & Nagel alleged that those concealed problems resulted in Ucamar's failure to deliver Kuehne & Nagel's cargo on time. The Fifth Circuit held that admiralty jurisdiction over the fraudulent inducement claim was improper, as Kuehne & Nagel failed to show that the alleged misrepresentations directly produced an injury at sea. *Id.* at 289. Rather, the court held that the tortious misrepresentations "had their desired 'effect' on land when they prompted Kuehne & Nagel to sign the contracts of affreightment." *Id.*

■■■■ The Plaintiffs contend that *Kuehne & Nagel* is factually distinguishable from their claims. Specifically, they contend that the arrest of a ship at sea is more properly considered an "injury at sea" than the refusal to permit discharge of cargo in *Kuehne & Nagel*. It is clear that the arrest of a vessel is an "injury at sea" and properly falls under maritime law. *Merchants Nat. Bank of Mobile v. Dredge General G.L. Gillespie*, 663 F.2d 1338, 1345 (5th Cir.1981). As the Plaintiffs note, "[t]he arrest of a vessel per force occurs on navigable waters" and is "an outgrowth of quintessential maritime activity, the transport of cargo." (Pls.' Mem. Opp'n Defs.' Mot. Dismiss for Lack of Subject Matter Jurisdiction at 16). Certainly, the alleged misrepresentations regarding ownership and disposition of the cargo which ultimately controlled the movement of the ships, the discharge of their cargo and their seizure by Metro

Trading's creditors were injuries at sea. Therefore, the "situs" requirement has been met.

The second requirement is that the tort bears a significant relationship to traditional maritime activity (nexus). *Executive Jet Aviation, Inc.*, 409 U.S. at 253, 93 S.Ct. 493; *Broughton*, 139 F.3d at 865. The movement of the ships and the discharge of their cargo are quintessential maritime activities. The alleged misrepresentations of Metro Trading are significantly related to those traditional maritime activities. Therefore, the "nexus" requirement has been met to establish maritime jurisdiction.

In a footnote, the Defendants raise the issue of whether admiralty jurisdiction is affected by the fact that the seizures of the Plaintiffs' ships occurred in the territorial waters of foreign nations-Singapore and the United Kingdom. There are district court decisions that support the Defendants' assertion that federal admiralty jurisdiction exists only over occurrences on the "high seas" or the navigable waters of the United States, and not over torts in other nations' territorial waters. *See St. Pierre v. Maingot*, 2002 WL 31655355, at *3 n. 8 (E.D.La.2002) (denying federal admiralty jurisdiction over tort occurring in territorial waters of the Cayman Islands); *Dunham v. Hotelera Canco S.A. de C.V.*, 933 F.Supp. 543, 547 (E.D.Va.1996) (denying admiralty jurisdiction over tort where injury occurred in territorial waters of Mexico); *Sharma v. Skaarup Ship Management Corp.*, 699 F.Supp. 440, 448 (S.D.N.Y.1988) (denying admiralty jurisdiction where injury occurred in territorial waters of British Columbia). These decisions generally rely on the Supreme Court's statement in *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 204 n. 2, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), that federal maritime jurisdiction extends only to torts oc-

curring on the "high seas or navigable waters." The issue in that case, however, was whether Alabama law or federal maritime law governed an injury to a worker on a pier driving cargo to a ship. The language in question was merely outlining the traditional situs test for maritime jurisdiction: if the tort occurred on water, federal maritime law applied. There is no indication that the Court was intentionally distinguishing torts in United States waters from torts in territorial waters of foreign nations. *See Sevison v. Cruise Ship Tours, Inc.*, 1997 WL 530267, at *6 n. 3 (D.Vi.1997).

On the other hand, numerous district courts have concluded that maritime jurisdiction exists over torts occurring in the navigable waters of other nations. *See, e.g., Szollosy v. Hyatt Corp.*, 208 F.Supp.2d 205, 211 n. 4 (D.Conn.2002) (recognizing split in authority but exercising admiralty jurisdiction over jet ski accident in Cayman Islands waters); *Afflerbach v. Cunard Line, Ltd.*, 14 F.Supp.2d 1260, 1263 n. 1 (D.Wyo.1998) (assuming admiralty jurisdiction over passenger disembarkation injury at Cayman Islands); *Sevison*, 1997 WL 530267, at *6 (holding injury suffered on sailboat docked in St. Kitts subject to admiralty jurisdiction). This conclusion is also echoed in prominent treatises. *See, e.g.,* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 33 (2d ed. 1975) ("Occurrences on foreign navigable waters may also ground admiralty jurisdiction."). The Court finds this line of authority more persuasive than that cited by the Defendants, particularly in a case such as this involving oceangoing ships engaged in international commerce. In terms of the exercise of maritime jurisdiction, it should not matter whether the vessels were arrested in port or on the high seas. The federal interest in the case is the same in either event. As to the maritime claims, the Motions to Dismiss should be denied.

### 3. Supplemental Jurisdiction

■■■ The Plaintiffs contend that if they establish admiralty jurisdiction over any of their claims against the Defendants, this Court may exercise supplemental jurisdiction over their remaining claims pursuant to 28 U.S.C. § 1367. To the extent that maritime jurisdiction is lacking as to any of the other tort claims, such as fraud in the inducement of the charterparty agreements and fraudulent conveyance of assets, the Court has subject matter jurisdiction as to those claims under the supplemental jurisdiction statute.

### B. Personal Jurisdiction

The plaintiff has the burden of establishing a *prima facie* case of personal jurisdiction over a nonresident defendant. *Meier v. Sun Intern. Hotels, Ltd.*, 288 F.3d 1264, 1268–69 (11th Cir.2002). "A prima facie case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict." *Id.* at 1269 (quoting *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir.1990)). Where the defendant submits affidavits to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction. *Meier*, 288 F.3d at 1269; *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1215 (11th Cir.1999). Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff. *Meier*, 288 F.3d at 1269; *Madara*, 916 F.2d at 1514.

### 1. Minimum Contacts

Due process requires that a nonresident defendant have certain minimum contacts with the forum, so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.

*International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Meier,* 288 F.3d at 1274. The nature and quality of these contacts vary depending upon whether the type of personal jurisdiction being asserted is specific or general. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Meier,* 288 F.3d at 1274. Specific jurisdiction must arise out of the events or transactions underlying the claim. The Defendants challenge the Plaintiffs' showing of either general or specific jurisdiction. As the Plaintiffs limit their response to claims of general jurisdiction, the Plaintiffs effectively concede that the Court lacks specific jurisdiction over their claims. Thus, this Court will confine its discussion to the establishment of general jurisdiction.[3]

A party is subject to the general jurisdiction of a court when it possesses "continuous and systematic" contacts with the forum. *Helicopteros,* 466 U.S. at 414–16, 104 S.Ct. 1868; *Meier,* 288 F.3d at 1274. If a forum has general jurisdiction over a defendant, the forum has personal jurisdiction over any cause of action brought against that defendant, regardless of whether the cause of action arises from the defendant's contacts with the forum. *Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868; *Consolidated Development Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1292 (11th Cir.2000). Consequently, constitutional requirements for general jurisdiction are more stringent than for specific jurisdiction. *Helicopteros,* 466 U.S. at 414, 104

S.Ct. 1868; *Meier,* 288 F.3d at 1274. For general jurisdiction to exist in this Court, the named Defendants must maintain "continuous and systematic general business contacts" with the state of Georgia. *Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868; *Meier,* 288 F.3d at 1274.

The named Defendants, in their individual capacities, have limited contacts, if any, with the state of Georgia. Defendants Mavrakakis, I. Kilakos, S. Kilakos, Gene, and Mayamar are not alleged to (and do not) transact any business in Georgia, and do not maintain offices or employees in Georgia. The Defendants do not own, rent, use or possess any real or personal property in Georgia. They do not maintain any bank accounts, telephone listings, or mailing addresses in Georgia. The Defendants are not obligated to and do not pay taxes in Georgia. The Defendants have not appointed any agent for service of process in Georgia. Moreover, none of the Defendants have ever traveled to the state of Georgia. (Mavrakakis Decl. ¶¶ 2–7; I. Kilakos Decl. ¶¶ 4–8, 14–16; S. Kilakos Decl. ¶¶ 4–8, 14–16; Gene Decl. ¶¶ 4–8, 14–16; Mayamar Decl. ¶¶ 4–9, 14–17). Thus, the Defendants do not, in their individual capacities, maintain "continuous and systematic general business contacts" with the state of Georgia. *Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868; *Meier,* 288 F.3d at 1274.

The Plaintiffs contend that the Defendants maintained continuous and systematic general business contacts with the state of Georgia through their relationship with Metro Trading and its association with

---

3. Additionally, the Court will forego a discussion of Georgia's long-arm statute, O.C.G.A. § 9–10–91, as recent case law holds that the long-arm statute confers personal jurisdiction to the maximum extent permitted by federal due process requirements. *Francosteel Corporation, Unimetal–Normandy v. M/V Charm,*

*Tiki, Mortensen & Lange,* 19 F.3d 624, 626 (11th Cir.1994); *Maxwell Chase Technologies, L.L.C. v. KMB Produce, Inc.,* 79 F.Supp.2d 1364, 1367 (N.D.Ga.1999). Thus, I will confine the discussion to the constitutional requirements to establish personal jurisdiction.

Metro Trading USA, Inc. ("Metro USA"). Thus, the Plaintiffs necessarily contend both (1) that Metro Trading is legally present in the jurisdiction because of the presence of its purported agent, Metro USA, and (2) that Metro Trading's corporate form was invalid so that Metro Trading's contacts with the jurisdiction could be attributed to the Defendants. This Court will turn first to the imputation of jurisdiction by agency and second to the contention that Metro Trading is, for purposes of determining personal jurisdiction, the corporate alter ego of the named Defendants.

### a. Agency

■■■■ There is not a well developed body of law on the imputation of personal jurisdiction through domestic agents. It is well established, however, that when a parent and a subsidiary are separate and distinct corporate entities, the presence of one in a forum state may not necessarily be attributed to the other. *Consolidated Development Corp.*, 216 F.3d at 1293 (citing *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 337, 45 S.Ct. 250, 69 L.Ed. 634 (1925)). Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state simply because its subsidiary is doing business there. *Consolidated Development Corp.*, 216 F.3d at 1293. Rather, where the "subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities of the subsidiary." *Id.*

■■ This precedent concerning parents and subsidiaries may be extended to other principal-agent relationships. *Meier*, 288 F.3d at 1273; *United Elec. Radio & Mach. Workers of America (UE) v. 163 Pleasant Street Corp.*, 987 F.2d 39, 45, 48 (1st Cir.1993). Personal jurisdiction over affiliated parties is warranted when the resident corporation acts on behalf of foreign affiliates. *Meier*, 288 F.3d at 1273. For a plaintiff to demonstrate that a district court has general personal jurisdiction over a nonresident corporation based on its affiliate's activities in the forum, the plaintiff would have to show that the affiliate's "corporate existence was simply a formality, and that it was simply [the nonresident corporation's] agent." *Consolidated Development Corp.*, 216 F.3d at 1293–94. Two Eleventh Circuit cases provide guidance in applying this test to determine whether a district court may exercise personal jurisdiction over foreign affiliates.

In *Consolidated Development Corp. v. Sherritt, Inc.*, 216 F.3d 1286 (11th Cir. 2000), the plaintiff argued that a Canadian corporation was amenable to service of process because its subsidiary marketed the defendant's products in the United States.[4] The defendant asserted that its domestic subsidiary had its own officers and directors, determined its own pricing and marketing practices, and had its own bank accounts, offices and employees. The court found nothing in the record to indicate that the domestic corporation's activities should be imputed to its corporate

---

**4.** The plaintiff argued that personal jurisdiction could be asserted over the defendant pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure. *Id.* at 1293. Rule 4(k)(2) broadens the geographical application of the minimum contacts doctrine beyond the boundaries of the forum state to include all contacts to the United States as a whole.

*World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717 (5th Cir.1996). As the Defendants' contacts with states other than Georgia do not substantially increase the Defendants' contacts with the nation, application of Rule 4(k)(2) is not required to engage in the proper minimum contacts analysis in this case.

parent to establish general personal jurisdiction. As the subsidiary maintained control over its own activities, the Eleventh Circuit held that the nonresident parent's contacts with the forum fell well short of the showing required for due process and dismissed the claims on jurisdictional grounds. *Id.* at 1294.

In *Meier v. Sun Intern. Hotels, Ltd.*, 288 F.3d 1264 (11th Cir.2002), the plaintiff was struck by a commercial motorboat while snorkeling in the Bahamas. He brought an action against the Bahamian corporations affiliated with the hotel where the motorboat owner conducted business. The plaintiff argued that the United States District Court for the Southern District of Florida had general personal jurisdiction over the nonresident Sun International corporations, as the corporations conducted substantial business activity in Florida through Florida subsidiaries. *Id.* at 1272. The Florida subsidiaries solicited and coordinated reservations for Sun International hotels, including the Atlantis, the hotel responsible for the motorboat. The Florida subsidiaries coordinated over fifty percent of all guests at Atlantis in 1999, the majority of whom were from the United States. The nonresident defendant contended that the related corporations were legally separate entities and that service contracts constituted the extent of the relationship between the corporations. *Id.* at 1272–73. However, the Florida subsidiaries also purchased goods, provided accounting and collection services, and coordinated all advertising and marketing for Atlantis. *Id.* Moreover, the Florida subsidiaries managed the defendant's bank accounts in Florida, meeting expenses incurred and paying itself out of these accounts. *Id.* at 1273. The Florida subsidiaries conducted all business solely for the defendant. *Id.* The Eleventh Circuit found that the financial ties between the defendant and

the Florida subsidiaries suggest "a relationship far beyond service contracts," in which the Florida subsidiaries were "mere instrumentalities" of the nonresident defendant. *Id.* at 1273, 1275. Consequently, it held that the defendant had sufficient contacts with the forum state to warrant general personal jurisdiction. *Id.* at 1275.

The facts asserted by the Plaintiffs, construed to favor the Plaintiffs, reveal contacts with the forum more substantial than those in *Consolidated Development Corp.*, but less extensive than those manifested in *Meier*. Metro USA is not a subsidiary of Metro Trading. Their corporate structures and directorships are wholly independent. Metro USA is a Georgia corporation formed by Edward Griffin that has worked to create business relationships for Metro Trading in the United States. (Gaitas Decl. at ¶ 37). Metro Trading was Metro USA's sole client, providing sufficient business for Metro USA that it did not actively seek other clients. (*Id.* ¶ 36, Ex. 10 at 50–52). Griffin and Metro USA were responsible for the creation of the Metro Group's website and the negotiation of several fuel oil delivery and storage agreements for Metro Trading. (*Id.* ¶¶ 34–35, 38–39, 43–44). Metro USA also provided a United States-based office for Metro Trading's operation of a joint venture with Alireza Mobil Terminals, S.A., a Panama-based corporation. (*Id.* ¶¶ 34–35). Inventories and other financial and accounting records for this joint venture were maintained at the Georgia office. (*Id.*) By 1997, Griffin was being paid $50,000 per month by Metro Trading to perform these consulting services. (*Id.* ¶ 37). He and Metro USA were listed as a Metro affiliate in the Metro Group's brochure. (*Id.* ¶ 33, Ex. 19).

■ Although the Plaintiffs demonstrate that Edward Griffin and Metro USA

conducted significant business with and for Metro Trading in the state of Georgia, Metro Trading's contacts with Metro USA do not establish the presence necessary for this Court to exercise general jurisdiction over Metro Trading under an agency theory. Metro USA was a wholly independent entity, bound to Metro Trading only by a contract for consulting services. This relationship does not evince "continuous and systemic" contacts, the "high threshold" required to hale a party into court in the forum on any claim. As the Plaintiffs fail to show the requisite contacts for general jurisdiction over Metro Trading, they do not establish personal jurisdiction over the Defendants, and dismissal based on lack of personal jurisdiction is proper.

### b. *Alter Ego*

Even if the Plaintiffs had established the minimum contacts required for general jurisdiction over Metro Trading, they must also demonstrate that jurisdiction over Metro Trading creates jurisdiction over the individual Defendants. The Plaintiffs contend that if Metro Trading is present in the forum, then the Defendants are present in the forum, as they assert that Metro Trading was the corporate alter ego of the Defendants. The Plaintiffs offer two rationales for finding that Metro Trading is the Defendants' alter ego: (1) that the holding of the Supreme Court of Greece that Metro Trading was a partnership and not a corporation renders the Defendant partners liable for its debts and (2) that evidence presented in previous proceedings, pursuant to Georgia law of "piercing the corporate veil," demonstrates that the Defendants abused the corporate form.

■ The Plaintiffs first contend that Metro Trading was not a valid corporate entity, and that, as de facto partners in Metro Trading, the named Defendants are subject to personal jurisdiction due to the activities of Metro Trading. The Plaintiffs rely on a December 20, 2002 *en banc* decision of the Supreme Court of Greece (the "*Arios Pagos* " decision) declaring Metro Trading invalid as a lawful corporate entity in Greece. (Gaitas Decl., Ex. 15 at *14). The Greek Supreme Court held that Metro Trading, a company incorporated under Liberian law, was not authorized to exercise corporate status in Greece. (*Id.*) The Plaintiffs assert that the doctrines of international comity and collateral estoppel direct this Court to recognize Metro Trading as a de facto partnership and to assert jurisdiction over the Defendant "partners." For the reasons discussed below, these doctrines do not render the *Arios Pagos* decision a final adjudication of Metro Trading's corporate status for the purpose of this suit.[5]

■ Under federal law, recognition of foreign judgments and proceedings is governed by principles of international comity. *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895). In *Hilton,* the Supreme Court held that if a foreign forum provided a full and fair trial before a court of competent jurisdiction, under a system of procedural fairness akin to the principles governing United States courts and in the absence of prejudice or fraud in the foreign forum, then "the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh ... upon the mere assertion of a party that the judgment was erroneous in law or in fact." *Id.* at 123, 16 S.Ct. 139.

---

**5.** The Court will set aside, for the moment, the fact that even if Metro Trading were deemed a de facto partnership for the purpose of this litigation, the Plaintiffs fail to demonstrate that the individual named Defendants (particularly those other than Defendants Mavrakakis and S. Kilakos) would qualify as partners of Metro Trading.

Federal courts have recognized judgments issued by Greek courts. *Diorinou v. Mezitis*, 132 F.Supp.2d 139 (S.D.N.Y.2000), *aff'd*, 237 F.3d 133 (2nd Cir.2001); *Mpiliris v. Hellenic Lines, Ltd.*, 323 F.Supp. 865, 872 (S.D.Tex.1969), *aff'd*, 440 F.2d 1163 (5th Cir.1971) (recognizing that "proceedings in the Greek Court appear to have been fair and regular, nothing in the record suggesting otherwise" and that "[s]ubstantial contacts existed with Greece, making the Greek Court an appropriate forum to adjudicate the dispute presented to that Court").

Similarly, the Plaintiffs contend that the doctrine of collateral estoppel dictates recognition that Metro Trading is not a valid corporate entity. Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). If a party has been given a "full and fair opportunity to litigate" a matter, he or she is precluded from further litigation of the same matter. *Id.* Although the Plaintiffs were not named as parties in the Greek proceedings, the Plaintiffs contend that the partner-owners of Metro Trading (that is, Defendants Mavrakakis, S. Kilakos, I. Kilakos, and Gene) amply and fully litigated the issue of whether, under Greek law, Metro Trading had been properly formed as a corporation. In this case, the Plaintiffs rely on the offensive use of collateral estoppel. *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Williams v. Bennett*, 689 F.2d 1370 (11th Cir.1982).

The doctrine of international comity does not provide an unqualified answer to the question of the corporate status of Metro Trading and its owners. The *Arios Pagos* decision cited Metro Trading's Greek domicile as sufficient grounds to permit the Greek court to use Greek law to determine its corporate status. A company's corporate status is ordinarily determined by reference not to the law of its state of domicile but rather to the law of its state or country of incorporation. *First Nat. City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). Thus, as a starting point, the law of Liberia, where Metro Trading is incorporated, and not the law of Greece, may govern the resolution of Metro Trading's corporate status. In an admiralty case like this, United States courts will often apply the choice of law factors outlined in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), to determine which nation's substantive law applies. *Solano v. Gulf King 55*, 212 F.3d 902, 905 (5th Cir. 2000). Thus, if the state-of-incorporation rule does not apply here, the substantive law of the forum selected by this Court pursuant to the *Lauritzen* test, and not necessarily the substantive law of Greece, may govern determination of Metro Trading's corporate status. The *Lauritzen* test cites as factors the place of the wrongful act (potentially England, France, UAE, Greece, Italy, Singapore, United States), the law of the flag (Malta), the allegiance or domicile of the injured (Malta), the allegiance of the defendant shipowner (Greece), and the place of the contract (England, Greece, or Sweden). As these factors loosely indicate that the substantive law of numerous jurisdictions could govern the action, the *Arios Pagos* decision may be irrelevant to the issue of whether Metro Trading is to be treated as a corporation.

Furthermore, the time charter agreements upon which the Plaintiffs' contract

claims are based contain English choice-of-law and English forum selection clauses. (Pls.' J.A. Mot. T.R.O. & Antisuit Inj., Ex. D, *Addax* Charterparty Agreement, ¶ 41; *id., Shoko* Charterparty Agreement, ¶ 41; *id., Epic* Charterparty Agreement, ¶ 41; *id., Cherry* Charterparty Agreement, ¶ 41 (collectively "Charterparty Agreements ¶ 41")). As the Plaintiffs have explicitly bargained for the application of English law and the use of an English forum in determining issues relevant to this litigation, Greek law and the *Arios Pagos* decision again seem less than dispositive.

Even if Greek law were to govern the adjudication of Metro Trading's corporate status and the *Arios Pagos* decision were to bind this Court, jurisdiction over Metro Trading would not necessarily extend to the Defendants. The *Arios Pagos* decision held that, since Metro Trading had not complied with certain corporate formalities, the company was not entitled to invoke the protections of Greek bankruptcy law. (Gaitas Decl., Ex. 15 at *14). The *Arios Pagos* decision simply reflects a technical filing oversight in Greece. It does not evince any commingling of corporate funds or other disrespect for corporate formalities (as would be needed to "pierce the corporate veil"). The decision neither identifies Metro Trading as an invalid legal entity nor holds that the Defendants may be sued individually on Metro Trading's contractual obligations. That is a logical extension of the judgment that the Plaintiffs seek this Court to make; it is not a decision actually and necessarily made by the Greek courts that would then

be subject to international comity and collateral estoppel. Furthermore, offensive collateral estoppel may not be used in this case because the individual Defendants were not parties to the Greek action. Thus, the *Arios Pagos* decision does not extend jurisdiction over Metro Trading to jurisdiction over the named Defendants.

■ Next, the Plaintiffs contend that Metro Trading is the alter ego of the individual named Defendants. Under federal common law,[6] the corporate veil may be pierced to recognize an alter ego only if the owner exercised complete control over the corporation with respect to the transaction at issue and such control was used to commit a fraud that injured the party seeking to pierce the veil. *Bridas,* 345 F.3d at 359 (citing *First Nat. City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611, 629–30, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983)). Under federal common law, "no uniform standard exists for determining when a corporation is the alter ego of its owners; each case must be decided based upon the totality of the circumstances." *Bridas,* 345 F.3d at 359; *Manhattan Const. Co.,* 1988 WL 150690, at *7. Exemplar factors in the factual inquiry include: (1) commingling of corporate and personal finances; (2) failure to hold director/shareholder meetings or maintain corporate records; (3) non-functioning of other officers/directors; and (4) whether failure to disregard the corporate fiction would be unjust or fundamentally unfair to an injured party. *Manhattan Const. Co.,* 1988 WL 150690, at *7–8.

---

6. The Plaintiffs cite Georgia law in determining whether Metro Trading is the alter ego or business conduit of the Defendants. If United States law is applicable to this determination, in a federal admiralty court, federal maritime (common) law is to be applied, not Georgia law. *Manhattan Const. Co. v. K & E Const. Co., Inc.,* 1988 WL 150690, at *7 (N.D.Ga.

1988); *see also Bridas S.A.P.I.C. v. Government of Turkmenistan,* 345 F.3d 347, 359 (5th Cir.2003). Regardless, both Georgia and federal courts apply a similar rubric, requiring that courts look to the totality of the circumstances to determine whether a corporation is the alter ego of its owners. *Manhattan Const. Co.,* 1988 WL 150690, at *7.

The Plaintiffs must demonstrate that Metro Trading is the alter ego of each Defendant. Defendants I. Kilakos, Gene, and Mayamar are not, and have never been, shareholders or owners of Metro Trading. As the Plaintiffs proffer no evidence, through affidavit or otherwise, pertinent to piercing the corporate veil as to these three Defendants, Metro Trading cannot be deemed their corporate alter ego. Thus, any personal jurisdiction established over Metro Trading does not extend to Defendants I. Kilakos, Gene, or Mayamar.

At the times relevant to this litigation, Defendants Ioannis Mavrakakis and S. Kilakos were owners of Metro Trading. The Plaintiffs allege that the December 31, 1996 Stock Transfer Agreement, conveying Metro Trading from Defendant Mavrakakis to Defendant S. Kilakos, was paid substantially from Metro Trading's own funds. (Gaitas Decl. ¶ 14, n.2 & Exs. 7–8). The Plaintiffs allege that Defendants Mavrakakis and Kilakos abused Metro Trading's corporate structure to their personal gain and to the Plaintiffs' detriment by draining the company's liquidity. *Id.* The Plaintiffs rely entirely upon the Gaitas Declaration and fail to respond to the Defendants' arguments that he has no personal knowledge of these matters. Therefore, the Court will disregard his declaration as to the alleged abuse of the corporate form. Accordingly, the Court finds no basis for piercing the corporate veil as to any of the Defendants.

2. *Fair Play and Substantial Justice*

■ In addition to demonstrating that a defendant has sufficient contacts with a forum, a plaintiff must show that asserting personal jurisdiction over the defendant comports with "traditional notions of fair play and substantial justice." *Meier,* 288 F.3d at 1276. In determining whether exercising jurisdiction would comport with traditional notions of fair play and substantial justice, a court looks at: (a) the burden on the defendant; (b) the forum state's interest in adjudicating the dispute; (c) the plaintiff's interest in obtaining convenient and effective relief; (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (e) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* at 1276 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

■ All of these factors counsel against this Court asserting personal jurisdiction over the present action. That the burden on the Greek Defendants of litigating this case in the Northern District of Georgia (or anywhere in the United States) would be immense does not require much explanation. None of the Defendants live in the United States. Little, if any, of the relevant physical evidence is located in the United States, and none of the relevant potential witnesses (save, perhaps, Metro USA representatives Edward Griffin and Chris Paul) reside in the United States. Given the foreign locations of the pertinent events and parties, Georgia has no identifiable interest in the adjudication of this dispute. The Plaintiffs are also foreign entities with little or no ties to Georgia, so it is unlikely that a suit in this Court would afford them relief any more convenient or effective than that currently sought or to be sought in England or Greece.

In determining whether asserting personal jurisdiction over the Defendants comports with fair play and substantial justice, this Court must also consider both the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the states in furthering fundamental social

policies. In this setting it seems most appropriate for this Court to consider the foreign antisuit injunction imposed upon the Plaintiffs by the Queen's Bench Division. In response to a July 2001 suit in this Court asserting similar claims, Glencore sought and obtained an antisuit injunction order from an English court prohibiting the Plaintiffs from prosecuting the United States suit. *Glencore International A.G. v. Metro Trading International,* 1998 Folio No. 273, at ¶¶ 40–41 (Q.B. Nov. 8, 2001) ("Queen's Bench Antisuit Injunction Order"). The English court held that the dictates of comity and ends of justice would be served by granting the antisuit injunction, as English courts had a greater interest in adjudicating that case than did this Court. *Id.* Although no similar antisuit injunction has been filed regarding the present action, it is significant that the English court deemed United States litigation of similar claims to be abusive and duplicative. *Id.* As the Plaintiffs' argument for personal jurisdiction over the Defendants hinges on Metro Trading's status as the Defendants' alter ego, a ruling that a suit against Metro Trading is unduly duplicative informs this Court that an additional suit against its principals would not promote efficiency. It stands to reason that this additional litigation in a new jurisdiction (when 35 lawsuits involving over 50 different parties have already been commenced in England, France, and Singapore) does not advance the efficient resolution of the controversy.

It also bears mentioning here that the charterparty agreements between the Plaintiffs and Metro Trading contain forum selection clauses requiring the Plaintiffs to litigate disputes arising under the charters in England. (Charterparty Agreements ¶ 41). Each contract includes the following provision: "This charter shall be construed and the relations between the parties determined in accordance with the laws of England. Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree." *Id.* The Plaintiffs contend that these forum selection clauses are inapplicable to the present actions, even the maritime contract claims, as the Defendants are not parties to these contracts. The Plaintiffs concurrently contend, for the purpose of establishing personal jurisdiction over the Defendants, that Metro Trading is the alter ego of the Defendants and that liability stemming from these contracts extends to the Defendants. Courts have found that a non-party to a contract can invoke that contract's forum selection clause where the non-party is an alter ego of the signatory. *Sealord Marine Co., Ltd. v. American Bureau of Shipping,* 220 F.Supp.2d 260 (S.D.N.Y. 2002); *see also Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1299 (11th Cir.1998) (where the interests of a nonparty are "completely derivative of," that is, "directly related to, if not predicated upon" those of a contracting party, the non-party is bound by the contract's forum selection clause). To permit a plaintiff to rely upon a defendant's relationship with the signatory for jurisdictional purposes and deny that relationship's salience to a forum selection clause would fail to advance fair play and substantial justice. *See XR Co. v. Block & Balestri, P.C.,* 44 F.Supp.2d 1296, 1301 (S.D.Fla.1999). As the enumerated factors above and the seemingly inconsistent use of Metro Trading status as the Defendants' alter ego each suggest that asserting personal jurisdiction over the Defendants would not comport with traditional notions of fair play and substantial justice, dismissal of the Plaintiffs' claims for lack of personal jurisdiction is proper.

## C. *Forum Non Conveniens*

█ Finally, the Defendants contend that this Court should decline to exercise

jurisdiction based upon the doctrine of *forum non conveniens.* It is undisputed that these actions involve foreign parties, foreign transactions and foreign events with no connection whatsoever to the United States. The doctrine of *forum non conveniens* "is an ancient common law doctrine that permits a court to decline jurisdiction over a case, even if personal jurisdiction and venue are otherwise proper, when there is a more convenient forum for the case to be litigated." *Esfeld v. Costa Crociere, S.P.A.,* 289 F.3d 1300, 1303 n. 4 (11th Cir.2002) (citing *American Dredging Co. v. Miller,* 510 U.S. 443, 448, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994)). A court may decline jurisdiction pursuant to the doctrine of *forum non conveniens* when (1) an adequate alternative forum is available, (2) public and private interests favor dismissal, and (3) the plaintiff may reinstate his suit in the alternative forum without undue inconvenience or prejudice. *Leon v. Millon Air, Inc.,* 251 F.3d 1305, 1310–11 (11th Cir.2001).

### 1. *Adequate Alternative Forum*

■ For a court to dismiss a claim based on *forum non conveniens,* an adequate alternative forum must be available. Availability and adequacy warrant separate consideration. *Id.* at 1311. An alternative forum is "available" to the plaintiff when it can assert jurisdiction over the litigation sought to be dismissed. *Id.* (citing *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 252 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)). A forum is "adequate" when it may provide a sufficient remedy. This standard does not require that the alternative forum provide the exact remedy sought from the domestic court. Rather, the Supreme Court has noted that dismissal may be improper where "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper,* 454 U.S. at

254, 102 S.Ct. 252. The Defendants argue that the United Kingdom and Greece, among other fora, are available and adequate alternative venues for resolution of the Plaintiffs' claims.

#### a. *United Kingdom*

■ The Defendants point to the United Kingdom as a more convenient forum because the Queen's Bench Division has already handled extensive proceedings between the Plaintiffs and other Metro Trading claimants and creditors regarding the same underlying facts as the present claims. The English court has significant experience with the facts, issues, individuals, and companies at issue in these claims and could, the Defendants contend, more conveniently and expeditiously resolve the Plaintiffs' claims. The Queen's Bench Division echoed the Defendants' contention in issuing an antisuit injunction, noting:

> In these circumstances, I have no doubt that the commencement of proceedings by the shipowners in the District Court of Georgia is vexatious and abusive and constitutes unconscionable conduct of the kind envisaged by Lord Brandon in the *South Carolina* case. Moreover, it is a striking feature of the case that Mr. Gee was hard-pressed to identify any respect in which his clients would be prejudiced if they were forced to pursue their claims in this country. It may be that under the law applicable in Georgia there is a greater willingness to recognise a relationship in the nature of a partnership than would be the case under English law, but it is not suggested that the shipowners could not obtain substantial justice in this country if they sought to pursue their claims here. To restrain the shipowners from proceeding in Georgia would not, therefore, deprive them of any significant advantage or otherwise work injustice.

(Queen's Bench Antisuit Injunction Order at ¶ 40). Considerations of international comity suggest that this finding is entitled to substantial deference. It is the sort of powerful evidence of an adequate and available forum which is rarely found in *forum non conveniens* litigation. The Plaintiffs offer little in the way of persuasive countervailing argument.

The Plaintiffs argue that the United Kingdom is not an "available" forum, as the English courts would not assert jurisdiction over the named Defendants. The general rule controlling personal jurisdiction in the European Union (EU) is that persons domiciled in an EU state must be sued in that state. (Council Regulation 44/2001 on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters, art. 2, para. 1, 2001 O.J. (L 12) 1). This rule, incorporated into English law by the Civil Judgments and Jurisdiction Act, 1982 (amended 2001), ch. 27 (Eng.), is subject to various exceptions. One such exception arises when parties to a contract have selected a forum to govern disputes arising out of their relationship. Article 23 of the Council Regulation 44/2001 states, in pertinent part:

> If the parties, one or more of whom is domiciled in a Member State, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have exclusive jurisdiction.

(Council Regulation 44/2001, art. 23). All of the named Defendants are domiciliaries of a Contracting State—Greece. The time charter agreements between the Plaintiffs and Metro Trading each have forum selection clauses agreeing to submit disputes to the laws and courts of England. (Charter-party Agreements ¶ 41). Each contract includes the following provision: "This charter shall be construed and the relations between the parties determined in accordance with the laws of England. Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree." *Id.* Thus, the parties to the time charter agreements, the Plaintiffs and Metro Trading, agreed to submit to the jurisdiction of the English Courts. The Plaintiffs, in attempting to establish this Court's personal jurisdiction over the Defendants, contend that Metro Trading is an invalid corporation and insist that jurisdiction over the Metro Trading partnership would extend to the individual Defendants. The Plaintiffs' own contention necessarily concludes that the named Defendants would be subject to the jurisdiction of English courts as partners or principals of Metro Trading. Thus, pursuant to the exception regarding forum selection agreements, the courts of the United Kingdom are likely "available" to the Plaintiffs for the present litigation.

Another exception permitting jurisdiction is that a person domiciled in an EU state may be sued in tort in the jurisdiction where the harmful events took place. (Houghton Decl. ¶ 18). The arrest of the *Shoko*, one of the Plaintiffs' chartered ships, occurred just off the coast of the United Kingdom. (*Id.* ¶ 7). Furthermore, common law principles of estoppel would operate to prevent the Defendants from arguing for dismissal of this action in favor of the English courts and then contesting their jurisdiction.

The Plaintiffs also argue that the United Kingdom is not an "adequate" forum, as its courts would not provide a sufficient remedy for the Plaintiffs' claims. The Plaintiffs contend that they would be limited in their damages remedy to compensatory damages, as English courts award punitive

damages only in exceptional circumstances. This Court finds that the diminished likelihood of a punitive damages award does not render the United Kingdom courts' remedy insufficient. Dismissal for inadequate remedy is appropriate only when "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper*, 454 U.S. at 254, 102 S.Ct. 252; *see also Leon*, 251 F.3d at 1310 (deeming unavailability of punitive damages irrelevant to *forum non conveniens* analysis). As the Plaintiffs claim nearly $1 million in compensatory damages, a reduced likelihood of additional punitive damages does not leave them with "no remedy at all."[7] As the United Kingdom courts have proper jurisdiction over the Plaintiffs' claims and will provide a sufficient remedy for the Plaintiffs' injuries, this Court holds that the United Kingdom is an adequate alternative forum available to the Plaintiffs.

### b. *Greece*

The Defendants also cite Greece as a more convenient forum than the United States, as nearly all of the parties to the litigation are domiciled there. Defendants Mavrakakis, S. Kilakos, I. Kilakos, and Gene reside in Greece. Defendant Mayamar is based in Greece. Moreover, all of the Plaintiffs maintain offices in Greece and conduct business in Greece. Dynacom, the Plaintiffs' manager, maintains its corporate headquarters in Greece.

Although the Plaintiffs concede that jurisdiction over the Defendants will be available in Greece,[8] they again contend that the unavailability of punitive damages from a Greek court renders a Greek remedy inadequate. As discussed above, this Court holds that the limitation of a remedy to compensatory damages does not render the remedy insufficient or the awarding forum inadequate. Given the documents and testimony available to the Plaintiffs from other trials and proceedings, the Plaintiffs have failed to show that any limitations upon discovery render the Greek courts inadequate. It is ironic that the Plaintiffs' principal argument in favor of the liability of the individual Greek Defendants is based upon a judgment of the Greek Supreme Court. The Plaintiffs note that the Greek judiciary provides "a system of procedural fairness akin to the principles governing the United States courts" and that "[v]arious federal courts have recognized judgments issued by Greek courts...." (Pls.' Mem. Opp'n. Defs.' Subject Matter Jurisdiction Mot. Dismiss at 8 n.3). Thus, as the Plaintiffs' own contentions suggest, Greece also provides an adequate alternative forum for resolution of the Plaintiffs' claims.

### 2. *Public and Private Factors*

■ After determining whether an adequate alternative forum exists, a court must weigh private and public interest factors to determine if the case could more conveniently be tried in the alternative forum. *C.A. La Seguridad v. Transytur Line*, 707 F.2d 1304, 1307 (11th Cir.1983). If the balance of relative interests favors

---

7. Indeed, if the Defendants' conduct is, as they necessarily contend, egregious enough to make the Plaintiffs' expected punitive damages so great that a compensatory damages award of $973,931.98 is "no remedy at all," one might well expect that the exceptional circumstances required to award punitive damages in the United Kingdom exist in this case.

8. Indeed, the only argument against a Greek forum's jurisdiction over the dispute would acknowledge the United Kingdom's exclusive jurisdiction over claims arising from the charterparties based on the forum selection clauses therein. Hence, the only argument against Greek jurisdiction supports use of an English forum, not a United States district court.

adjudication in the foreign forum, the court may dismiss the action. *Id.*

### a. *Private Interest Factors*

■ In considering private interests, a court must generally start with a presumption against disturbing the plaintiff's initial forum choice. *C.A. La Seguridad,* 707 F.2d at 1307. This presumption arises, initially, because "[t]here is a strong federal interest in making sure that plaintiffs who are United States citizens generally get to choose an American forum for bringing suit, rather than having their case relegated to a foreign jurisdiction." *Esfeld v. Costa Crociere, S.P.A.,* 289 F.3d 1300, 1311 (11th Cir.2002). However, "the bias towards the plaintiff's choice of forum is much less pronounced when the plaintiff is not an American resident or citizen." *Id.* at 1312, n. 15. "Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." *C.A. La Seguridad,* 707 F.2d at 1307 (quoting *Piper,* 454 U.S. at 256, 102 S.Ct. 252).[9] This presumption is even further eroded when it appears that a plaintiff's choice of forum is motivated by forum-shopping considerations. *Iragorri v. United Technologies Corp.,* 274 F.3d 65, 72 (2nd Cir.2001); *see also Sigalas v. Lido Maritime, Inc.,* 776 F.2d 1512, 1520 (11th Cir.1985) (characterizing plaintiff as "the archetypal foreign plaintiff bringing her foreign tort claim to American courts to secure relief more generous than she would get under the law of her homeland" and noting that "Greece has strong contacts with this case. America has virtually none."); *In re Rezulin Products Liability Litigation,* 214 F.Supp.2d 396, 400 (S.D.N.Y.2002) ("plaintiff seeks to justify litigating here in part by noting that Canada does not permit punitive damages ... a point immaterial to the *forum non conveniens* analysis but one that underscores the fact that the plaintiff's suit here is the product of forum shopping."). Thus, any presumption that the United States is the proper forum for the Plaintiffs' claims is substantially exploded.

■ Among the private interest factors a court considers in *forum non conveniens* analysis are: (1) relative ease of access to evidence; (2) ability to obtain witnesses; (3) possibility of view of the premises, if relevant; and (4) all other considerations "that make trial of a case easy, expeditious and inexpensive." *C.A. La Seguridad,* 707 F.2d at 1307. The first private factor considered in *forum non conveniens* analysis is whether an alternative forum provides easier access to sources of proof. *C.A. La Seguridad,* 707 F.2d at 1307. To examine the relative ease of access to evidence, a district court must "scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of evidence cited by the parties are critical, or even relevant, to the plaintiff's causes of action and to any potential defenses to the action." *Van Cauwenberghe v. Biard,* 486 U.S. 517, 528, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988). The Plaintiffs stress that Metro USA, the Georgia-based company through which the Plaintiffs attempt to assert personal jurisdiction over the Defendants, maintained records for Metro Trading in Georgia and served as a link

9. Indeed, in this case, the United States may not even be properly considered the Plaintiffs' initial choice of forum. Given the forum selection clauses in the maritime contracts, the English courts may be considered the Plaintiffs' chosen forum. In addition, the holding of the Queen's Bench Division suggests that proceedings in the United States against Metro Trading's principals are efforts to revive claims originally asserted in the United Kingdom. (Queen's Bench Antisuit Injunction Order at ¶¶ 40–42).

between third parties and Metro Trading. (Gaitas Decl. ¶ 44). As a result, they contend, reasonable grounds exist for this Court to assume that Metro USA and its principal Edward Griffin possess physical evidence in the United States of the Defendants' alleged misrepresentations to the Plaintiffs. It appears that the evidence cited by the Plaintiffs is neither critical nor even relevant to the claims at bar.[10] The primary evidence cited by the Plaintiffs relates to the nature and business of the alleged joint venture between Glencore and Metro Trading, an issue that has already been extensively litigated and resolved in the English courts. (*See id.* at ¶ 67). Moreover, as the Defendants are all citizens and residents of Greece, Metro Trading formerly maintained its headquarters in Greece, the Plaintiffs' corporate manager Dynacom maintains offices and does business in Greece, and George A. Gaitas, Dynacom's General Counsel and the Plaintiffs' key witness to date, maintains an office in Greece (from which he issued his affidavit for these proceedings), much of the evidence required for trial would be accessed more easily by Greek courts than by United States courts.[11] Thus, the alternative fora proffered by the

Defendants appear to provide easier access to evidence regarding the Plaintiffs' claims.

The second private factor in *forum non conveniens* analysis is the ability to obtain witnesses. *C.A. La Seguridad,* 707 F.2d at 1307. The Defendants acknowledge that virtually all of the potential witnesses in this case are likely to be outside the United States.[12] None of the parties are domiciled in the United States. The Defendants contend that the Federal Rules of Civil Procedure, by permitting witnesses to testify by foreign telecast or using videotaped deposition, obviate any advantage that a non-United States forum may have in accessing foreign witnesses. This observation, however, fails to acknowledge both the number of witnesses for whom these accommodations would have to be made and the significant judicial preference for live testimony. *See DiRienzo v. Philip Services Corp.,* 294 F.3d 21, 30 (2nd Cir.2002) (citing these considerations as integral in weighing this factor in favor of movants). Accommodating travel and shipping for live testimony in this Court would likely impose greater costs on the parties than similar accommodations in an

10. Indeed, the Plaintiffs' failure to assert specific jurisdiction over the claims at bar suggests that the relationship between Metro USA and Metro Trading had little or no connection to the charter agreements between the Plaintiffs and Metro Trading or, more importantly, to the Plaintiffs' claims associated with these agreements.

11. The Plaintiffs assert that "evidence in this case appears to lie scattered across the United Kingdom, Greece, Singapore, the United States, Sweden and the United Arab Emirates...." (Pls.' Br. Opp'n Defs.' Mot. Dismiss Pursuant to Doctrine of *Forum Non Conveniens* ("Pls.' FNC Opp'n Br.") at 13). In this case, where the evidence is scattered around the world and the alleged injuries took place in numerous European nations (including the United Kingdom and Greece), the

prior litigation in the United Kingdom and the ease of access to parties and records in Greece suggest that either of these European fora would be a more convenient location to resolve the dispute. *See Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 952 (11th Cir.1997) (holding that where evidence and witnesses were "scattered throughout the world ... England or Luxembourg, where more of the allegedly fraudulent acts occurred, would be a more convenient location to resolve th[e] dispute.")

12. The Plaintiffs list only Metro USA representatives Edward Griffin and Chris Paul as well as representatives of Mobil and Texaco International Trader, Inc. as potential witnesses who reside in the United States and are subject to this Court's subpoena power. (Pls.' FNC Opp'n Br. at 16).

English or Greek forum.[13]  Moreover, the Plaintiffs fail to consider that some potential witnesses may require translators if forced to testify in the United States.[14] (*See, e.g.,* Gaitas Decl., Ex. 12 at ¶ 54);  *see also Gazis v. John S. Latsis (USA) Inc.,* 729 F.Supp. 979, 989 (S.D.N.Y.1990) (ordering *forum non conveniens* dismissal in part because "most of the potential witnesses do not speak English, requiring the parties to hire translators and interpreters").  Thus, the European fora also appear to provide more convenient access to potential witnesses.

The final private factor identified by the Eleventh Circuit is considerations "that make trial of a case easy, expeditious and inexpensive."  *C.A. La Seguridad,* 707 F.2d at 1307.[15]  One such consideration that bears on the expediency of a trial is the ability of that court to enforce its judgment.  *BCCI Holdings,* 119 F.3d at 953 (ordering *forum non conveniens* dismissal partly "[b]ecause the BCCI defendants ha[d] no remaining assets in this country," rendering a United States judgment unenforceable).  None of the Defendants have any identifiable property or assets in the United States. (2d Mavrakakis Decl. ¶ 7; 2d Mayamar Decl. ¶ 5; S. Kilakos Decl. ¶ 11).  As any judgment against the Defendants in a United States court may be effectively unenforceable, this forum is not the most expedient for resolution of the Plaintiffs' claims.  In summary, the private interest factors weigh heavily in favor of dismissal of the Plaintiffs' claims pursuant to the doctrine of *forum non conveniens.*

### b.  *Public Interest Factors*

■  In addition to considering private interests, a district court engaging in *forum non conveniens* analysis must consider the public interest in entertaining the lawsuit.  Factors in this assessment include: "court congestion and jury duty generated by controversies having no relation to the forum; the desirability of having localized controversies decided at home; and the difficulties attendant resolving conflict-of-laws problems and applying foreign law."  *C.A. La Seguridad,* 707 F.2d at 1307.  The Defendants describe the Plaintiffs' actions as "involving foreign claims between foreign parties arising out of alleged foreign events and transactions" and thus lacking "any meaningful connection to the United States." (Defs.' Reply Br. Supp. Mot. Dismiss Pursuant to Doctrine of *Forum Non Conveniens* at 1).  This is essentially correct.  The only connection between the parties and the United States is Metro USA's contractual relationship with the Defendants through Metro Trading, a relationship which is essentially unrelated to the transactions and claims at issue.  The Plaintiffs request that this Court expend significant resources to adjudicate claims stemming from contracts signed abroad by foreign parties and arrests of vessels car-

13. To wit, flight expenses alone would be substantially diminished by keeping the litigation in Europe.  For example, as the Defendants note, a rough sampling of internet fares indicated that round-trip business class travel between Athens, Greece and Atlanta, Georgia would be over five times as expensive as the same level of service between Athens and London purchased during the same time period (1/5/04–1/9/04).  *See http://www.expedia.com* (last visited Nov. 10, 2003).

14. It is clear that this problem would extend to proceedings in the United Kingdom, but issues of translation from Greek to English may be obviated in the Greek courts.  The additional problem of translating vital documents from English into Greek would, however, remain.

15. Neither the Plaintiffs nor the Defendants deem a view of the premises relevant in the present action.  Thus, I will not discuss this third factor in *forum non conveniens* analysis.

rying foreign cargo in foreign territorial waters or on the high seas. This community should not be burdened with such a task. "The public interests identified by *Gilbert* include court calendar congestion; a recognition that '[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation.'" *Flores v. Southern Peru Copper Corp.*, 253 F.Supp.2d 510, 543 (S.D.N.Y.2002) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)); *see also Tisdale v. Shell Oil Co.*, 723 F.Supp. 653, 658 (M.D.Ala.1987) (discussing the "administrative difficulties caused by congestion of local court dockets with foreign lawsuits").[16] The undue expenditure of significant resources by this forum and its surrounding community · for resolution of claims in which this community has no interest suggests that dismissal pursuant to *forum non conveniens* is appropriate.

A second public interest factor is the desirability of "having localized controversies decided at home." *C.A. La Seguridad*, 707 F.2d at 1307. As the Plaintiffs correctly note, the claims at bar are not "localized controversies," but rather claims arising from around the world. Underlying this factor, however, is the public interest in having foreign courts with stronger claims to jurisdiction over the matter adjudicate such claims. *See Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1303 n. 4 (11th Cir.2002). The interest in international judicial comity is a critical component of *forum non conveniens* determina-

tions. *Ford v. Brown*, 319 F.3d 1302, 1310 n. 22 (11th Cir.2003). Pursuant to the forum selection clauses in the maritime agreements and the English courts' assertion of jurisdiction over related claims stemming from the same events and transactions, the English courts possess a stronger claim to jurisdiction over the present matters than does this Court. Indeed, the English antisuit injunction, prohibiting the Plaintiffs from filing substantially similar claims in this Court, suggests that this Court would not advance international judicial comity by retaining jurisdiction over this litigation. Thus, although the present controversy clearly is not "localized" in the United Kingdom or Greece, these European courts, with greater claims to jurisdiction over the action, provide more appropriate fora for its resolution.

■ The third factor considers whether a complex conflict-of-laws analysis or the application of foreign law to the claims would make resolution of the claim in this Court unduly difficult. The Plaintiffs contend that Georgia law regarding conflict-of-laws should be applied in the instant case, as "[i]n a diversity case, a federal court must apply the conflict-of-laws doctrine of the forum in which it sits." (Pls.' FNC Opp'n Br. at 22). This argument is plainly inapplicable in the present case as jurisdiction of most of the claims is admiralty and not diversity jurisdiction. Irrespective of the choice of law analysis employed, this Court would likely be required to engage in the significant interpretation

---

**16.** The Plaintiffs suggest that analysis of court congestion need be comparative and that the Defendants must demonstrate that the proffered alternative fora (here, the United Kingdom or Greece) are less congested than this Court. The decisions cited by the Plaintiffs in support of this contention, though, are not *forum non conveniens* analyses, but rather section 1404 transfer decisions. This Court

finds no reason that comparative congestion analysis should be applied in *forum non conveniens* decisions. In any event, the Defendants' assertions, supported by affidavits, that "the British and Greek courts are not so congested as to preclude the expeditious adjudication of plaintiffs' actions" satisfy this Court. (McParland Decl. ¶¶ 100–101); (Avreamas Decl. ¶ 12).

and application of foreign law.[17] A *forum non conveniens* dismissal is desirable when it "obviate[s] the need to engage in 'complex exercises in comparative law.'" *Sigalas,* 776 F.2d at 1519 (citing *Piper,* 454 U.S. at 263, 102 S.Ct. 252). Thus, "[t]he need to resolve and apply foreign law should 'point [the trial court] towards dismissal.'" *Id.* In the present action, this Court would be forced to engage in the significant interpretation and application of foreign law, further suggesting that dismissal of the action pursuant to the doctrine of *forum non conveniens* is proper. In summary, the public interest factors also weigh heavily in favor of dismissal on the basis of *forum non conveniens.* The Defendants' motions should be granted for all of these reasons.

## III. *CONCLUSION*

For the reasons set forth above, the Defendants' Motions to Dismiss for Lack of Personal Jurisdiction are GRANTED and the Defendants' Motions to Dismiss Pursuant to the Doctrine of *Forum Non Conveniens* are GRANTED. The Defendants' Motions to Dismiss for Lack of Subject Matter Jurisdiction are DENIED.

---

17. Application of the choice of law provision in the forum selection clauses would require this Court to interpret and apply the laws of England. Resort to the *Lauritzen* factors would require this Court to engage in a complex choice of law analysis, and then, as the factors would almost certainly suggest that foreign law be applied, would likely require this Court to apply and interpret foreign laws.